UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JERRY KREVINGHAUS,

        Plaintiff,                Case No. 15-cv-11615

v.                                Honorable Thomas L. Ludington

HILLS & DALES GENERAL HOSPITAL, INC.,

        Defendant.

_____/

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DISMISSING COMPLAINT WITH PREJUDICE**

Plaintiff Jerry Krevinghaus filed this lawsuit against Defendant Hills & Dales General Hospital, Inc. ("Hospital") on May 5, 2015. He alleges that the Hospital violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Michigan Persons With Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws 37.1201, by subjecting him to an allegedly unwarranted fitness-for-duty examination and then subsequently terminating his employment.

Defendant moved for summary judgment on March 23, 2016. Def.'s Mot. Summ. J., ECF No. 15. That motion is now under consideration. Defendant argues that Krevinghaus cannot establish that he is "otherwise qualified to perform the essential functions of a position, with or without accommodation." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014). Defendant also argues, in the alternative, that Krevinghaus cannot demonstrate that he was subject to an adverse employment action since it appropriately directed him to undergo a fitness-for-duty evaluation and then properly terminated his employment when he prevented the completion of the examination.

**I.**

Plaintiff Krevinghaus is a 62-year-old resident of Rhodes, Michigan. Krevinghaus suffers from Bipolar Disorder.

Defendant Hills & Dales General Hospital is a domestic not-for-profit corporation operating as a hospital in Cass City, Michigan.

**A.**

Defendant hired Krevinghaus as the "Director of Patient Accounting" on December 6, 2010. The job posting described this position as follows:

> Directs, plans organizes, executes and evaluates the activities of Billing functions including Billing Clerk, Patient Accounting Clerks, Credit and Collection Clerk, etc. This position interfaces within all levels of the organization and ensures the efficient billing and collection efforts and assures the delivery of exemplary service to other hospital departments, physicians and the public.

Pos'n Descr. 1, Ex. 3, Def.'s Mot. Summ. J., ECF No. 15-4. The job description also contained the following disclaimer at the top of the posting:

> The statements below are intended to describe the general nature of accountability for this position. They are not intended to be construed as an exhaustive list of all responsibilities, duties and skills required to ensure the delivery of high quality, appropriate patient/customer care and effective hospital operations.

*Id.* The job description lists twelve different "Position Accountabilities" that are akin to job duties:

1. Support the mission, vision, goals and Standards of Performance of Hills & Dales General Hospital; initiate processes and contribute to the continuous improvement initiatives for enhancing revenue cycle management as well as processes within other departments.

2. Participate fully as a member of the management team to support the achievements of the hospital and individual objectives; develop and implement programs and plans to achieve hospital and individual goals.

3. Develop operating budgets for assigned areas of accountability and monitor departmental expenses to stay within budget and meet established financial and key performance indicators goals and objectives.

4. Develop, recommend and implement policies, procedures and practices that support employee and organization development and meet required hospital, accrediting and regulatory policies and guidelines including compliance with all federal, state and local laws.

5. Safeguards the public image of the hospital and ensures patient confidentiality at all times.

6. Initiates departmental procedures, creates and executes staff schedules and promotes participation in the hospital's in-service programs/adult education/college programs to ensure high quality service.

7. Interfaces with patients, employees and hospital departments and physicians.

8. Creates and ensures quality controls, accuracy and check-and-balances in all initiatives to achieve zero patient registration, coding and billing errors and thus minimize duplication of work.

9. Promotes and ensures timely completion and compliance with all departmental deadlines.

10. Directs the activities of billing and collection personnel. Interviews and participates in the selection and hiring of candidates, 30-60-90 day evaluations and coaches employees for improved work performance; participates in corrective action, suspensions and employment terminations when required.

11. Coordinator for the hospital's arbitration program.

12. Accepts other duties as assigned.

*Id*. at 1–2 (sic throughout).

"One or two days after [Krevinghaus] started," he told the Hospital that he has Bipolar Disorder. Krevinghaus Dep. 39, Ex. 1, Def.'s Mot. Summ. J., ECF No. 15-2. About one year later, "approximately a year after [he] began," Krevinghaus stopped taking his medication for his Bipolar Disorder. He did not inform anyone at the Hospital that he had stopped taking his medication.

**B.**

Almost two years after going off his medication, Krevinghaus's behavior changed. The Hospital began receiving complaints in the middle of October 2013 about Krevinghaus's

behavior. This behavior included claims that Krevinghaus would interrupt meetings and prevent members of his team from asking questions during those meetings. E'ee Compls. 1, 14, Ex. 5, Def.'s Mot. Summ. J., ECF No. 15-6. This behavior also occurred at meetings with other hospitals and with vendors. *Id*.

Krevinghaus was also alleged to have had inappropriate interactions with coworkers outside of the office setting or related to non-work topics. For example, one coworker's husband "gives Jerry Krevinghaus'[s] wife a massage every week." *Id*. at 2. Krevinghaus wanted to take the coworker and her husband to dinner to express his gratitude. *Id*. When the coworker informed Krevinghaus that her husband was not available for the date Krevinghaus picked, he offered to take only the coworker (Krevinghaus's wife would also attend the dinner). *Id*. When the coworker declined, Krevinghaus asked the coworker to get massages with him and his wife. *Id*. The coworker noted that she was "not trying to get [Krevinghaus] into any trouble" but that she was "just very concerned and want[s] to see him get help if he needs it." *Id*.

In another incident, Krevinghaus intercepted a coworker in the parking lot and presented her with "a bottle of wine in a paper sack." *Id*. at 3. "He then followed her into the hospital to the registration desk (where she works) and was 'hugging' on her." *Id*. The coworker indicated that "she felt 'weirded out' by his behavior." *Id*. One coworker reported that Krevinghaus purchased earrings for her and stated "make sure you wear those at work." *Id*. at 13. Another was given a similar gift: "He . . . asked me if I like Michigan or Michigan State. I told him Michigan and the next day he sent me a pair of Michigan earrings." *Id*. at 14.

Some employees questioned Krevinghaus's use and allocation of human resources. An employee alleged that Krevinghaus "took all his staff to [a] funeral home for visitation of another [department] employee[]" while the employees were on the clock. *Id*. at 5.

Most of the employees reporting to the Hospital about Krevinghaus expressed general concern with his erratic behavior during the month of October 2013. They noted that he was not acting consistent with his former demeanor and felt there was something off about him.

## C.

On October 24, 2013, following a series of employee complaints, the Vice President of Human Resources sent a letter to Krevinghaus "summarize[ing] the two past discussions" that the he and another administrator had with Krevinghaus. Letter to Krevinghaus, Ex. 6, Def.'s Mot. Summ. J., ECF No. 15-7. The letter and the earlier conversations informed Krevinghaus that the Hospital has put him on paid administrative leave and that Krevinghaus would need to undergo a fitness-for-duty evaluation before he could return to work. This decision was based on Krevinghaus's "recent unusual and threatening behavior involving [his] employees as well as others in the organization." *Id*. The Hospital's letter scheduled two appointments for Krevinhaus's evaluation. It also asked that he "[p]lease sign any release documents so that I will be able to receive the results of the evaluations." *Id*. Finally, the letter advised that Krevinghaus is not to "contact employees by telephone or text." *Id*.

Early in November 2013, after being placed on leave, Krevinghaus made two unsolicited visits to coworkers' homes. One coworker explains the incident in an email to the Vice President of Human Resources:

> I was not home on Saturday morning and Tina Mulrath who is my neighbor called me to let me know that [Krevinghaus] had stopped by her house on Saturday morning. While I was not home and my brother was at home with my children I had a visitor also. Jim said that [Krevinghaus] had stopped by to bring over a paper of something that was going on this Saturday and he had [a] ticket and wanted me to know about it. My kids and I think [Krevinghaus] is a great person but with what is going on here and us not knowing exactly what the reasoning that he is off makes me a little uncomfortable for him to pay me a visit at my home, especially if my children are there alone. I do not think anything would happen but I do not want to put my kids in that situation.

*Id*. at 16.

**D.**

Krevinghaus appeared for both scheduled evaluations. He was asked by both evaluating medical professionals to provide certain prior medical information. According to Krevinghaus, he attempted to get that information but his prior doctor "wouldn't send [him] anything." Krevinghaus Dep. 65. Krevinghaus also did not sign a release that would have enabled the medical professionals evaluating him to independently contact his prior doctors to obtain the information.

Because the evaluating doctors could not obtain Krevinghaus's prior medical information, they could not complete the fitness-for-duty examination. Krevinghaus was not certified to return to work.

On December 3, 2013, Defendant terminated Krevinghaus's employment. It explained that

> Our recent discussions and letters required you to provide a fitness-for-duty certification. You have refused to comply with the requests of both Occupational Medicine and the recommendations of List Psychological to obtain a release which would enable you to return to work. Seven weeks have transpired and I have not received a 'fitness for duty' release for you to return to employment.

Dec. 3, 2013 Termination Letter, Ex. 9, Def.'s Mot. Summ. J., ECF No. 15-10. The letter also noted that Krevinghaus had not provided any Family and Medical Leave Act paper work. Finally, it informed him that "[y]our refusal to comply with . . . these requests indicates to us that you are not interested in continued employment at Hills and Dales General Hospital. Therefore, your employment is being terminated effective immediately as of December 3, 2013." *Id*.

**II.**

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(a). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must draw all reasonable inferences in favor of the non-movant when reviewing the evidence and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### III.

Defendant claims that Krevinghaus has not demonstrated a prima facie case of discrimination under the ADA. To establish a prima facie case under the ADA, Krevinghaus must show that: "(1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability." *Demyanovich*, 747 F.3d at 433. Defendant argues

in its motion that Krevinghaus cannot establish that he is qualified to perform the essential functions of his job or that he suffered an adverse employment action.

**A.**

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Thus, if an individual's disability renders him unable to perform an "essential function" of his job, he is not a "qualified individual" protected by the non-discrimination provision of section 12112. In such an instance, the Act does not require an employer to continue employing the disabled employee, nor does it require the employer to offer that employee an accommodation." *Wagner v. Sherwin-Williams Co.*, No. 15-5975, 2016 WL 2641257, at *2 (6th Cir. May 10, 2016).

Defendant contends that Krevinghaus could not perform the essential functions of his job with or without reasonable accommodation. To guide the determination of whether particular job functions are essential, the ADA establishes that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C.A. § 12111(8). In essence, a job function is essential "if its removal would 'fundamentally alter' the position." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001) (citation omitted).

A job function may be considered essential for several reasons, including the following:

  (i)  The function may be essential because the reason the position exists is to perform that function;

  (ii)  The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

  (iii)  The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2). The Sixth Circuit has established that the determination of whether a job function is essential should be based on "more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988). Factors to consider when determining whether a job function is essential include:

> (1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs.

*Keith v. County of Oakland*, 703 F.3d 918, 925–26 (6th Cir. 2013) (citing 29 C.F.R. § 1630.2(n)(3)).

Defendant maintained a written job description for Krevinghaus's position. Krevinghaus was the "Director of Patient Accounting" and reported to the hospital's Chief Financial Officer. The position description explains that it is "not intended to be construed as an exhaustive list of all responsibilities, duties and skills required to ensure the delivery of high quality, appropriate patient/customer care and effective hospital operations." Pos'n Descr. 2, Ex. 3, Def.'s Mot. Summ. J., ECF No. 15-4. The position summary notes that "[t]his position interfaces within all levels of the organization and ensures the efficient billing . . . and collection efforts and assures the delivery of exemplary service to other hospital departments, physicians and the public." *Id*. Further, the position requires the following "accountabilities": "[p]articipate fully as a member

of the management team to support the achievement of the hospital and individual objectives"; "Safeguard[] the public image of the hospital and ensure[] patient confidentiality at all times"; and "[i]nterface[] with patients, employees and hospital departments and physicians." *Id*. Finally, the position seeks "[e]xcellent verbal and written communication skills." *Id*. at 3.

During October of 2013, a number of complaints were made by Krevinghaus's co-workers, including individuals that reported to Krevinghaus. These complaints expressed concerns with Krevinhaus's demeanor around the hospital. E'ee Compls., Ex. 5, Def.'s Mot. Summ. J., ECF No. 15-6. They also noted erratic behavior by Krevinghaus in his interactions with members of Hospital staff both during and outside of work hours. At least one individual identified what she thought was a violation of patient privacy laws by Krevinghaus. E'ee Compls. at 6 (noting that Krevinghaus was "talking @ desk using patient name while office rooms open [and] patients in them").

Krevinghaus's behavior, by the complaints of Defendant's own employees, interfered with the efficient operation of the workplace. Krevinghaus's coworkers and subordinates attested to the discomfort they felt with his erratic behavior and how it impaired the relationship the Hospital had with some of its vendors. Defendant validly determined that the list of troubling behavior by Krevinghaus was evidence that he could no longer perform the essential functions of his job.[1]

**B.**

In any event, even if Krevinghaus could perform the essential functions of his job, he cannot demonstrate an adverse employment action. He alleges that being subject to a fitness for duty evaluation and then being terminated meet that standard. The two, however, are interrelated.

---

[1] Krevinghaus did not request any reasonable accommodation.

Krevinghaus's employment was terminated because he was not given a fit for duty certification. The fitness for duty examination was withheld because Krevinghaus did not provide the examining physician with sufficient prior medical information for the physician to make a fitness determination.[2] Thus, if Krevinghaus was improperly sent for a fitness for duty examination, that is an adverse employment action and, a fortiori, so is his termination. If, on the other hand, he was properly sent for a fitness for duty evaluation that could not be completed for reasons related to his noncooperation, then his termination was not an adverse employment action.

An employer may request that an employee undergo a medical examination where the employer "had a reasonable basis for believing that [the employee] was unable to perform the essential functions of her job or that she posed a direct threat to her own safety or the safety of others." *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 624 (6th Cir. 2014) (internal citations omitted). *See also Barnum v. Ohio State Univ. Med. Ctr.*, No. 15-3450, 2016 WL 683251, at *6 (6th Cir. Feb. 19, 2016) (quoting *Kroll* and extending *Kroll*'s test to all compulsory medical examinations directed by employers). "The burden is on the defendants in this case to show that the required mental-health evaluations were 'job-related and consistent with business necessity.'" *Id*. (quoting 42 U.S.C. § 12112(d)(4)(A)) (citing *Denman v. Davey Tree Expert Co.,* 266 F. App'x 377, 379 (6th Cir. 2007)). "[T]hat burden is quite high." *Wright v. Illinois Dep't of Children & Family Servs.*, 798 F.3d 513, 523 (7th Cir. 2015). "Thus, for an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999).

---

[2] The nature in which Krevinghaus would have provided this information or made it available is not entirely clear from the record. What is indisputable is that the examining doctor sought information from a prior doctor of Krevinghaus's and was unable to obtain that information despite asking Krevinghaus to make that information available.

Defendant argues that it both had a reasonable basis for believing that Krevinghaus was unable to perform the essential functions of his job and that he posed a direct threat to his own safety or the safety of others.

**1.**

There is sufficient evidence to lead Defendant to reasonably believe that Krevinghaus could not perform the essential functions of his job. As already explained, supra § III.A, Krevinghaus engaged in a pattern of activity that was detrimental to the working relationships at the Hospital and the Hospital's perception by patients and the public. Even if, on those facts, Krevinghaus could actually still perform the essential functions of his job (and he could not) it was not unreasonable for the Hospital to conclude that he was unable to do so. Krevinghaus's "'aberrant behavior' raise[d] the concern that [his] mental or emotional instability could undermine [his] ability to complete [his] job functions effectively in the employer's work environment. *Kroll*, 763 F.3d at 625. Accordingly, the Hospital was within their discretion to seek a medical examination of Krevinghaus.

**2.**

Next, and in the alternative, Defendant argues that Krevinghaus posed a threat to himself or others, necessitating a medical examination. In *Kroll*, the Sixth Circuit articulated the standard for analyzing when an employee poses a "direct threat" sufficient to warrant a compulsory medical examination:

> An employee poses a "direct threat" when she creates "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3); *see also Prevo's Family Mkt.,* 135 F.3d at 1095. An assessment of whether an employee poses a direct threat must be "individualized" to the employee's abilities and job functions and "based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r). In determining whether a direct threat exists, the court should consider: "(1) [t]he

duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." *Id*.

*Kroll*, 763 F.3d at 625–26.

Defendant's motion does not present an analysis of these factors. Defendant's analysis focuses only on two incidents where Krevinghaus visited the home of a coworker. But there is no evidence that this rises to "a significant risk to the health or safety of others." The employee whose home was visited did attest to being made "a little uncomfortable" but also noted that she "d[id] not think that anything would happen." E'ee Compls. 16. While perhaps a cause for concern, it does not rise to the level of a "direct threat." Indeed, it is much closer to behavior that is "merely annoying" and insufficient to warrant a compulsory medical examination. *Sullivan*, 197 F.3d at 811.

**3.**

Much of this is moot, however, because Krevinghaus did not submit to the fitness for duty evaluation. He was not returned to work because the analyzing physician was unable to make a determination on Krevinghaus's fitness. Although Krevinghaus appeared for the evaluation, he did not provide important medical information to the analyzing physician that would have allowed a full analysis. Krevinghaus's refusal to submit to the full fitness evaluation "precluded him[] from being able to establish a genuine issue of material fact as to whether the exams were related to his job, or were too broad in scope." *Sullivan*, 197 F.3d at 812. In any event, Krevinghaus has not submitted any argument that the fitness for duty examination was in any way improper. He only argues, cursorily, that he was not incapable of performing his job and was not a "direct threat." He produces no evidence in support of those arguments.

Because Krevinghaus's arguments that he should not have been subject to a fitness for duty examination are meritless and he does not argue that the examination was improper, he

cannot demonstrate that it was an adverse employment action. *Sullivan*, 197 F.3d at 813 ("[A]n examination ordered for valid reasons can neither count as an adverse job action nor prove discrimination."). Further, the Hospital terminated Krevinghaus's employment because of his incomplete fitness-for-duty examination. Krevinghaus's termination is an adverse employment action but since it "was based on his refusal to undergo the valid examination[]," it was not done for "a discriminatory reason." *Sullivan*, 197 F.3d at 813.

### IV.

Defendant also moves for summary judgment on Krevinghaus's PWDCRA claim. The ADA and the PWDCRA "share the same purpose and use similar definitions and analyses." *Chiles v. Mach. Shop, Inc.*, 606 N.W.2d 398, 405 (Mich. Ct. App. 1999). Because Krevinghaus's claims under the PWDCRA would result in the same analysis as his ADA claims, his PWDCRA claim will also be dismissed. *See, e.g.*, *Peden v. City of Detroit*, 680 N.W.2d 857, 870–73 (2004) (endorsing identical analysis as ADA when evaluating PWDCRA claims).

### V.

Accordingly, it is **ORDERED** that Defendant Hills & Dales General Hospital's motion for summary judgment, ECF No. 15, is **GRANTED**.

It is further **ORDERED** that Plaintiff Jerry Krevinghaus's Complaint, ECF No. 1, is **DISMISSED with prejudice**.

Dated: June 3, 2016                                    s/Thomas L. Ludington
                                                       THOMAS L. LUDINGTON
                                                       United States District Judge

- 15 -

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 3, 2016.

                                        s/Michael A. Sian
                                        MICHAEL A. SIAN, Case Manager